UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MICHAEL F. STALKA, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>BOSTON COMMUNICATIONS GROUP, INC., KAREN A WALKER and EDWARD H. SNOWDEN,<br><br>Defendants. | CIVIL ACTION NO.<br><br>CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS<br><br>JURY TRIAL DEMANDED<br><br>03 cv 12486 WGY<br><br>MAGISTRATE JUDGE Dein |

Plaintiff Michael F. Stalka, on behalf of himself and all other persons similarly situated, by plaintiff's undersigned attorneys, for plaintiff's Complaint, alleges upon the investigation made by and through plaintiff's counsel, which included, *inter alia*, a review of relevant public filings made by Boston Communications Group, Inc. ("BCGI" or the "Company") with the Securities and Exchange Commission, as well as, tele-conferences, press releases, news articles, analyst reports, and media reports concerning the Company. This complaint is based upon plaintiff's personal knowledge as to plaintiff's own acts, and upon information and belief as to all other matters, based upon the aforementioned investigation.

## SUMMARY OF ACTION

1. This is a class action on behalf of all persons, other than defendants, who purchased, converted, exchanged or otherwise acquired BCGI securities during the period from April 16, 2003, and July 16, 2003, inclusive (the "Class Period") to recover damages caused by defendant's violations of the federal securities law.

## JURISDICTION AND VENUE

2. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. § 240.10b-5].

3. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

4. Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b). Many of the acts and practices complained of herein occurred in substantial part in this District and BCGI maintains its corporate headquarters in this District.

5. In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

6. Plaintiff Michael F. Stalka purchased shares of BCGI common stock as set forth more fully in the annexed certificate and suffered economic damages.

7. BCGI is a Massachusetts corporation and maintains its principal executive offices at 100 Sylvan Road, suite 100 Woburn, Massachusetts. BCGI provides real-time subscriber management services to the wireless industry including billing and transaction processing services which enables carriers to offer prepaid wireless calling to their subscribers, roaming services which provide wireless carriers the ability to generate revenues from subscribers who are not covered under traditional roaming agreements by arranging payment for roaming calls, and prepaid systems which assembles and markets prepaid systems to international carriers and assembles the voice nodes used to support its voice resource network

8. The defendants listed below served, during the period specified, as senior officers and/or directors of BCGI:

(a) Defendant Karen A. Walker ("Walker") was the Chief Financial Officer of BCGI during the Class Period.

(b) Defendant Edward H. Snowden ("Snowden") was BCGI's President and Chief Executive Officer during the Class Period.

9. Walker and Snowden are sometimes referred to herein as the "Individual Defendants." Because of the Individual Defendant's positions with the Company, the Individual Defendants had access to the adverse undisclosed information about the Company's business, operations, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.

10. It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of defendants identified above. Each of the above officers of BCGI, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, products, growth, financial

statements, and financial condition, as alleged herein. Said defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

11.     As officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was traded on the NASDAQ, and governed by the provisions of the federal securities laws, the defendants each had a duty to disseminate promptly, accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information. The Individual Defendant's misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

12.     The Individual Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. Because of their Board membership and/or executive and managerial positions with BCGI, each of the defendants had access to the adverse undisclosed information about BCGI business prospects and financial condition and performance as particularized herein and knew (or

recklessly disregarded) that these adverse facts rendered the positive representations made by or about BCGI and its business issued or adopted by the Company materially false and misleading.

13. The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

14. Each of the defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of BCGI securities by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding BCGI's business, operations, management and the intrinsic value of BCGI's common stock; and (ii) caused plaintiffs and other members of the Class to purchase BCGI's securities at artificially inflated prices.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

15. Plaintiffs brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of all those who purchased BCGI common stock during the Class Period and who suffered damages (the "Class"). Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns and any entity in which defendants have or had a controlling interest.

16. The members of the Class are so numerous that joinder of all members is impracticable. According to the Company's report filed on Form 10-Q with the SEC on November 14, 2003, BCGI has approximately 18.5 million shares of common stock outstanding as of November 3, 2003. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by BCGI or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

17. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendant's wrongful conduct in violation of federal law that is complained of herein.

18. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

19. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by defendant's acts as alleged herein;

(b) whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations, financial condition and management of BCGI; and

(c) whether defendants acted knowingly or recklessly in making materially false and misleading statements during the Class Period;

(d) whether the market prices of the Company's common stock was artificially inflated or distorted during the Class Period because of defendant's conduct complained of herein; and

(e) to what extent the members of the Class have sustained damages and the proper measure of damages.

20. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### Fraudulent Scheme and Course of Business

21. Each defendant is liable for (i) making false statements, or (ii) failing to disclose adverse facts known to him about BCGI. Defendant's fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of BCGI common stock was a success, as it (i) deceived the investing public regarding BCGI prospects and business; (ii) artificially inflated the prices of BCGI common stock; (iii) allowed the Individual Defendants to secure lofty bonuses; and (iv) caused plaintiffs and other members of the Class to purchase BCGI common stock at inflated prices

7

**FALSE AND MISLEADING STATEMENTS DURING CLASS PERIOD**

22. On April 16, 2003, the first day of the Class Period, the Company issued a press release. The press release stated in pertinent part:

> Boston Communications Group Reports Record Earnings And Exceeds Expectations For The First Quarter Of 2003
>
> Boston Communications Group, Inc. today announced that its consolidated GAAP net income for the first quarter ended March 31, 2003 totaled $3.3 million, or $0.18 per share, which includes $915,000 in legal charges, or $0.03 per share after taxes, primarily to defend the Freedom Wireless suit. These record earnings were up 64% sequentially over the 2002 fourth quarter GAAP earnings of $0.11 per share. In the first quarter of 2002, the Company reported a net loss of $1.5 million, or $0.09 per share, which included $3.3 million in pre-tax legal charges, or $0.11 per share. Total revenues for the first quarter increased 53% to $23.1 million from $15.0 million in the first quarter of 2002 and increased 9% from $21.1 million in the fourth quarter of 2002.
>
> Billing and Transaction Processing Services
> Billing and Transaction Processing Services, which include the Company's Prepaid Wireless Services, Voyager Billing and Customer Care, and Payment Services, generated record revenues of $21.1 million in the first quarter of 2003, a 74% increase over the first quarter of 2002 and an 18% increase over the 2002 fourth quarter. The increase in revenues, which have a corresponding low incremental cost, contributed to higher gross margins on Billing and Transaction Processing Services Revenues of 76%, compared to 68% in the first quarter of 2002 and 73% in the fourth quarter of 2002. The higher than expected revenues and corresponding gross margins were principally due to very strong net prepaid subscriber additions of 455,000 for the quarter. Total prepaid subscribers on the platform are now 3.35 million, a 69% increase over March 31, 2002.
>
> **"Our outstanding performance for the quarter reflects the solid positioning of our Billing and Transaction Processing Services business.** The strength of our prepaid subscriber additions for the quarter continues to validate our carrier customers' success in selling to the under-penetrated youth and budget conscious segments with attractive prepaid customer propositions that are based on solid carrier economics. This year in particular, gross additions across most all of our carrier customer programs continued with nice momentum well beyond the typical end of holiday promotions. More and more, our carriers are offering a rich consumer experience with postpaid-like features using our real-time rating, billing, and customer care solutions that are generating new growth while reducing operational costs and churn," commented E. Y. Snowden, President and CEO.

Freedom Wireless Update
During the quarter ended March 31, 2003, the Company incurred $915,000 in legal costs, or approximately $0.03 per share after taxes, primarily for the continued defense of the Freedom Wireless patent infringement suit. These costs are in line with previous guidance and are expected to continue at this level until the matter is resolved. There are no developments to report on the case and exact timing of procedures has not been determined. There has also been no change to the Company's position on the case and *bcgi* remains confident that it does not infringe the Freedom Wireless patents and that the patents are invalid in light of prior art.

Outlook
**"Our tremendous growth in first quarter subscriber additions was the key factor in our earnings growing more than 60% compared to the fourth quarter of 2002.** Although we are now entering the seasonally slower second and third quarters, we believe that our carrier's commitment to prepaid and our business model and value proposition will continue to position *bcgi* for growth and healthy profits. As a result, we are raising our annual 2003 earnings guidance," commented Karen A. Walker, Chief Financial Officer.

The Company is raising its 2003 GAAP earnings to $0.78 to $0.80 per share, which includes an estimate of $0.12 per share in legal costs primarily to defend the Freedom Wireless lawsuit. This guidance is more than four times higher than the Company's 2002 annual GAAP earnings of $0.19 per share. For the second quarter of 2003, the Company anticipates GAAP earnings of $0.19 to $0.20 per share, which includes $0.03 per share in estimated legal costs. "Our business model continues to be validated and our overall financial position, with $48.6 million in cash and investments and no debt, gives us the strength to capitalize on weaknesses across the telecommunications industry. This is evidenced by our recent building purchase that will initially house our second data center and our ability to continue to attract and retain top talent across our organization," commented Ms. Walker.

**Mr. Snowden concluded, "We are obviously very pleased with our performance for the quarter and as a leader in real-time billing and transaction processing services, we feel that we are well positioned to continue to execute on our business plan.** By serving both the largest national carriers and the smaller regional U.S. carriers who have just begun to gain momentum with their prepaid offerings, we look forward to continuing to competently provide them the best platform to demonstrate competitive success in a challenging industry."

(Emphasis Added)

23. The information concerning BCGI's relationship with Verizon as disclosed in the April 16, 2003 press release was misleading. Before releasing the information, BCGI knew or was reckless in not knowing, that Verizon was seriously considering various alternatives to contract renewal, including the development of internal capabilities, or "insourcing," the work being performed by BCGI, or the use of a competitor's products. At the time the information was disclosed therefore, BCGI knew, or was reckless in not knowing, that the negotiations were anything but "customary" and that, more than ever, BCGI was at risk of losing Verizon as a customer and therefore 52% of the Company's revenue.

24. On April 17, 2003, Defendant Walker sold 14,418 BCGI shares, more than 28% of her personally controlled Company stock, for proceeds of approximately $257,000.

25. On April 17, 2003, Defendant Snowden sold 4,600 shares of his personally controlled Company stock for proceeds of approximately $78,200.

26. On April 21, 2003, Defendant Snowden sold another 4,600 shares of personally controlled Company stock for proceeds of approximately $92,000.

27. On April 24, 2003, First Analysis Securities Corporation issued a report by its' analyst, Howard Smith. In this report, Smith stated that he believed the contract between BCGI and Verizon would be renewed, an opinion Smith based, in part, on BCGI's specific comments concerning the Verizon negotiations.

28. On May 1, 2003, Defendant Snowden sold 14,100 shares of personally controlled Company stock for proceeds of approximately $249,781.

29. On May 15, 2003 the Company filed a quarterly financial report with the SEC on Form 10-Q for the first quarter 2003, the period ending March 31, 2003. In the report, the Company hinted that it faced specific concerns relating to the Company's contract with Cingular

and its business concentration with Verizon and Cingular. Yet, the Company attempted to allay these concerns by commenting that it expected to renew its contract with Verizon Wireless, a departure from Company policy not to comment on ongoing contract negotiations In the report, the Company stated in pertinent part:

> Certain Factors That May Affect Future Results
>
> *The loss or significant reduction of business from one of our major customers, including Verizon Wireless or Cingular Wireless, would have a material adverse effect on our business.*
>
> Historically, a significant portion of our revenues in any particular period has been attributable to a limited number of customers in the wireless telecommunications business. This concentration of customers continues and increased in 2003 as Verizon Wireless represented 51% and Cingular Wireless represented 27% of our consolidated revenues for the three months ended March 31, 2003. Our dependence on Verizon and Cingular is expected to continue at similar levels until our new carrier customers and expanded programs generate more revenue.
>
> **Our Verizon Wireless prepaid wireless services contract and certain other contracts expire in 2003 and beyond. While we expect to renew these contracts, when and if each of the contracts is renewed, some contractual rates per minute may be lower than in previous years and at lower rates than we have estimated.** These contracts are not exclusive and therefore do not prevent our customers from using competitors' billing and transaction processing platforms.
>
> We currently service only Cingular's TDMA markets and Cingular uses other vendors to service its GSM markets. As Cingular expands the buildout of its GSM network overlay, there is no guarantee that Cingular will not migrate its existing TDMA prepaid business onto the GSM network or that we would be chosen as the supplier for prepaid services on Cingular's GSM network. If Cingular's TDMA customers migrate to GSM technology, our revenue from this TDMA business would decrease. In addition, we must compete with other vendors to obtain Cingular's GSM business, including vendors already chosen by Cingular to provide this service in some existing markets, and we can give no assurance that we will obtain this business.

(Emphasis in Original)

30. The Company's concerns regarding Cingular, as expressed in the Form 10-Q filed in May 2003, were picked up by Howard Smith, the analyst from First Analysis Securities Corporation, who, on May 16, 2003, published a second report, via First Analysis, that echoed the concerns voiced by BCGI. Smith claimed in the May 16, 2003, report that the concerns surrounding the contract with Cingular and the uncertainty surrounding the Verizon contract, could, "provide downside pressure to the [Company's] shares in the near term."

31. The information contained in the First Quarter 2003 Form 10-Q concerning BCGI's relationship with Verizon was materially misleading. BCGI knew or was reckless in not knowing, before issuing the information, that Verizon was seriously considering various alternatives to contract renewal, including the development of internal capabilities, or "insourcing," the work being performed by BCGI, or the use of a competitor's products.

32. On June 2, 2003, Defendant Snowden sold 14,100 shares of personally controlled Company stock for proceeds of approximately $235,536.

33. On June 12, 2003, Mike Latimore ("Latimore") an analyst with Raymond James and Associates ("Raymond James"), issued a research report on BCGI, following a meeting between Raymond James and BCGI management the previous day (the "Raymond James Meeting"). At the Raymond James Meeting, BCGI informed Latimore that it would not comment on the on-going contract negotiations with Verizon, but according to the Latimore report, BCGI did "refer to a recent statement by the 50% customer, where Verizon said it was happy with BCGI and the outsourcing solution."

34. BCGI's decision not to comment on the contract negotiations with Verizon, and its reference to the Verizon statement as described above, constituted a material omission and a false and misleading act. BCGI knew, or was reckless in not knowing, that Verizon was seriously