considering various alternatives to contract renewal with BCGI, including the development of internal capabilities, or "insourcing," the work being performed by BCGI, or using a competitor's products. BCGI also knew that the statements made to Raymond James would enter the public domain.

35.     On July 1, 2003, Defendant Snowden sold 14,100 shares of personally controlled Company stock for proceeds of approximately $209,974.

36.     On July 8, 2003, Defendant Snowden sold 4,600 shares of personally controlled Company stock for proceeds of approximately $92,000.

37.     On July 11, 2003, Verizon made a formal request to BCGI to assist Verizon in testing an internal system that would provide essentially the same services as provided by BCGI. In other words, Verizon had requested that BCGI assist Verizon in creating its own 'in-house' service, a business move by Verizon that would significantly reduce BCGI's revenue in the long-term.

38.     On July 16, 2003, and only after the Individual Defendants had sold approximately $1,214,491 worth of personally controlled Company shares, BCGI finally revealed in a press release the truth concerning the Company's contract negotiations with Verizon. The press release stated in pertinent part:

> Boston Communications Group Reports Earnings For The Second Quarter Of 2003
>
> Boston Communications Group, Inc. today announced that its consolidated GAAP net income for the second quarter ended June 30, 2003 totaled $4.1 million, or $0.22 per share, which includes $725,000, or $0.02 per share after taxes, in legal charges to defend the Freedom Wireless suit. These earnings were up 183% over net income of $1.4 million, or $0.08 per share, for the second quarter of 2002. Total revenues for the second quarter increased 52% to $26.4 million from $17.4 million in the second quarter of 2002 and increased 15% from $23.1 million in the first quarter of 2003.

13

For the six months ended June 30, 2003, *bcgi* reported GAAP net income of $7.4 million, or $0.40 per share, which includes $1.6 million, or $0.05 per share after taxes, in legal charges primarily to defend the Freedom Wireless suit. This represents a significant increase over the break-even results for the six months ended June 30, 2002. The increase in GAAP earnings for the six month period was principally the result of a 71%, or $18.7 million increase in Billing and Transaction Processing revenues.

## Billing and Transaction Processing Services
Billing and Transaction Processing Services, which include the Company's Prepaid Wireless Services, Voyager Billing and Customer Care, and Payment Services, generated revenues of $24.1 million in the second quarter of 2003. This represents a 68% increase over the second quarter of 2002 and a 14% increase over the first quarter of 2003. Gross margins on Billing and Transaction Processing Services Revenues were 75% compared to 71% in the second quarter of 2002. The gross margin for the second quarter of this year was slightly below the first quarter 2003 gross margin of 76% principally due to resources added to support the Company's growth and both additional and one-time costs incurred to start-up the Company's new building in Bedford, Massachusetts. The higher than expected revenues were principally due to higher than expected billed minutes of use, which on average were 113 minutes per month per subscriber. In addition, net prepaid subscriber additions were 230,000 for the quarter, bringing total prepaid subscribers on the platform to 3.58 million, a 64% increase over June 30, 2002.

"Our performance for the quarter reflects the continued momentum and strength of our carriers' prepaid offerings, leading to strong subscriber growth and billed minutes of use. Our carrier customers continue to show their commitment to the marketing and promotion of profitable, branded prepaid solutions in segments that have previously been under-served. We are also pleased with our ability to sign up new customers across our widening breadth of wireless service offerings, particularly in our Payment Services business," commented E. Y. Snowden, President and CEO.

## Freedom Wireless Update
During the quarter ended June 30, 2003, the Company incurred $725,000 in legal costs, or approximately $0.02 per share after taxes, primarily for the continued defense of the Freedom Wireless patent infringement suit. These costs are below previous guidance. Going forward, costs are not expected to exceed our previous quarterly guidance of $0.03 per share after tax, until the matter is resolved. There has been no change to the Company's position on the case and *bcgi* remains confident that it does not infringe the Freedom Wireless patents and that the patents are invalid and unenforceable in light of prior art and for other reasons.

**Verizon Wireless Contract Renewal Update**
As the Company has stated in its public disclosures, its contract with Verizon
Wireless is scheduled, according to its terms, to be renegotiated in 2003. The
Company is currently in contract discussions with Verizon Wireless. The terms
and conditions, including the length of the contract and pricing have not yet been
determined. **Verizon Wireless has also requested that *bcgi* provide support
services to assist Verizon Wireless in testing its own internal prepaid
platform in 2004 which could potentially displace prepay services currently
being provided by *bcgi*.** None of the Company's contracts are exclusive and its
carrier customers have and continue to use and/or test competing products in
certain markets. The Company believes *bcgi's* real-time transaction processing
and support solutions best meet the technology, functionality and profitability
goals of its carriers today, and in the future.

**Outlook**
The Company is raising its 2003 GAAP earnings guidance to $0.87 to $0.88 per
share from $0.78 to $0.80 per share, which includes an estimate of $0.11 per share
in legal costs primarily to defend the Freedom Wireless lawsuit. The Company
anticipates GAAP earnings of $0.23 to $0.24 per share for the third quarter of
2003 and $0.24 to $0.25 per share for the fourth quarter of 2003, both of which
include $0.03 per share in estimated legal costs.

Mr. Snowden concluded, "The quality of our services, robust features and cutting-
edge technology have enabled the leading wireless carriers to gain momentum
and market share in one of the highest growth segments in wireless. In addition,
new products that we have launched and those that are in development enable
wireless carriers to not only expand their competitive offerings, but increase
average revenue per user (ARPU) on existing programs. We continue to be
focused on our long-term strategy and the prudent investments we continue to
make in new features, products and businesses are expected to enable us to
continue to retain and expand existing and new customer relationships. Our
Billing and Transaction Processing Services business remains well positioned to
capitalize on our carrier's continued emphasis on prepaid as an integral part of
their wireless growth strategy."

39.    News of Verizon's intention to "insource" BCGI services caused an immediate

negative reaction from the Company's investors and by the close of trading on July 17, 2003, the

price of BCGI's shares had fallen to $12.70 down $8.45 (40%) on very heavy volume.

40.    On July 17, 2003, Reuters news agency published an article concerning BCGI's

shock announcement that the Company would likely lose 52% of its revenue in 2004. This article

included comments from Verizon spokesperson Brenda Raney, who confirmed that Verizon had already begun work on a pre-payment billing system. Moroever, the article reported that during the July 16, 2003, conference call the Company held as part of its earnings announcement, defendant Snowden stated that on July 11, 2003, Verizon had told BCGI that it was creating its own internal billing system instead of continuing to utilize BCGI's billing services. The service BCGI provides to Verizon is a highly complex, pre-paid billing system. Prepaid billing systems are complex because `real-time' information about a customer's balance is needed to ensure the customer has enough credit to make a telephone call. Therefore, any pre-paid billing system created by Verizon, even in part, would have required significant consultation and significant research and development expenditure by Verizon.

## SCIENTER ALLEGATIONS

41.    As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated by or in the name of the Company were materially false and misleading; knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violators of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding BCGI and its business practices, their control over and/or receipt of BCGI allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning BCGI, were active and culpable participants in the fraudulent scheme alleged herein. Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing

public. The ongoing fraudulent scheme described in this complaint could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and complicity of the personnel at the highest level of the Company, including the Individual Defendants.

42.    The Individual Defendants engaged in such a scheme to inflate the price of BCGI securities in order to: (i) protect and enhance their executive positions and the substantial compensation and prestige they obtained thereby; (ii) maximize the value the defendants received from disposing of their personal holdings of BCGI securities at inflated prices. Individual Defendants collectively sold approximately $1.2 million worth of personally controlled Company stock during the Class Period at prices inflated by their fraudulent conduct.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

43.    At all relevant times, the market for BCGI securities was an efficient market for the following reasons, among others:

(a)    BCGI's stock met the requirements for listing, and was listed and actively traded on the Nasdaq, a highly efficient and automated market;

(b)    As a regulated issuer, BCGI filed periodic public reports with the SEC and the Nasdaq;

(c)    BCGI regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

17

(d)     BCGI was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

44.     As a result of the foregoing, the market for BCGI's securities promptly digested current information regarding BCGI from all publicly available sources and reflected such information in BCGI's stock price. Under these circumstances, all purchasers of BCGI securities during the Class Period suffered similar injury through their purchase of BCGI securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

45.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of BCGI who knew that those statements were false when made.

18

## FIRST CLAIM

### Violation Of Section 10(b) Of The Exchange Act And Rule 10b-5
### Promulgated Thereunder Against All Defendants

46.     Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

47.     During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including plaintiffs and other Class members, as alleged herein; and (ii) cause plaintiffs and other members of the Class to purchase BCGI securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

48.     Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for BCGI securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

49.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of BCGI as specified herein.

50.    These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of BCGI value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about BCGI and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of BCGI securities during the Class Period.

51.    Each of the Individual Defendant's primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

20

52.     The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendant's material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing BCGI operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by defendant's misstatements of the Company's business, operations and earnings throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

53.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of BCGI securities was artificially inflated during the Class Period. In ignorance of the fact that the market prices of BCGI publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, plaintiffs and the other members of the Class acquired BCGI securities during the Class Period at artificially high prices and were damaged thereby.

54.     At the time of said misrepresentations and omissions, plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had plaintiffs and the other members of the Class and the marketplace known the truth regarding the true

financial position, operating conditions and expenses that BCGI was experiencing, which were not disclosed by defendants, plaintiffs and other members of the Class would not have purchased or otherwise acquired their BCGI securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

55.     By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

56.     As a direct and proximate result of defendant's wrongful conduct, plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM

### Violation Of Section 20(a) Of The Exchange Act Against the Individual Defendants

57.     Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

58.     The Individual Defendants acted as controlling persons of BCGI within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiffs contend are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiffs to be misleading prior to and/or shortly after

22

these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

59.     In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

60.     As set forth above, BCGI and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.   As a direct and proximate result of defendant's wrongful conduct, plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray for relief and judgment, as follows:

A.     Determining that this action is a proper class action, designating plaintiffs as Lead Plaintiff and certifying plaintiffs as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.     Awarding compensatory damages in favor of plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendant's wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: December 10, 2003

**SHAPIRO HABER & URMY LLP**

Respectfully submitted,

By: _Theodore M. Hess-Mahan_

Theodore M. Hess-Mahan, Esq. BBO #557109
75 State Street
Boston, MA 02109
Telephone: (617) 439-3939
Facsimile: (617) 439-0134

**WOLF HALDENSTEIN ADLER
FREEMAN & HERZ, LLP**
Fred T. Isquith, Esq.
Christopher S. Hinton, Esq.
270 Madison Avenue
New York, New York 10016
Telephone: (212) 545-4600
Facsimile: (212) 545-4653

**LAW OFFICES OF BRUCE G. MURPHY**
Bruce G. Murphy, Esq.
265 Llwyds Lane
Vero Beach, FL 32963
Telephone: (772) 231-4020

341655

24